# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# COLUMBUS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | CASE NO.: 4:18-CV-143 (LJA) |
| AMANDEEB SINGH, AMRINDER SINGH, GURPREET SINGH, KAMALJIT SINGH, and IQBAL SINGH, | : | |
| Defendants. | : | |

## ORDER

Before the Court are the United States of America's Complaint, Motion for Temporary Restraining Order, and Emergency Motion for Order of Authorization. Docs. 1, 2, 3. For the reasons stated below, the Motions, Docs. 2 & 3, are **GRANTED in part and DENIED in part**.

In its Motions, the United States of America (hereinafter the Government) seeks an emergency order allowing the U.S. Immigration and Customs Enforcement (ICE) division of the U.S. Department of Homeland Security, acting through the Stewart Detention Center (SDC):

> to perform laboratory tests and physical evaluations to monitor and assess Defendants Amandeeb Singh's, Amrinder Singh's, Gurpreet Singh's, Iqbal Singh's, and Kamaljit Singh's clinical conditions (i.e., drawing of blood and urinalysis for laboratory testing, physical examination, and administration of medications, if needed) and, if medically necessary, to involuntarily administer fluids to Defendants at SDC in Lumpkin, Georgia. Restraints may be needed to accomplish this involuntary monitoring, treatment, and administration of fluids.

Doc. 3 at 1. The Government has not sought an order authorizing that Defendants be force-fed. *See* Docs. 1, 2, 3. The Court relied on affidavits by Dr. Eugene Charbonneau and

Matthew Lenze and held an emergency hearing in this matter on July 11, 2018. *See* Docket; Docs. 1-1 & 1-2. At the hearing, testimony was provided by Dr. Charbonneau, clinical director at the SDC. Defendants were physically present and provided testimony.

Dr. Charbonneau testified that all Defendants have been on a hunger strike, defined as the cessation of meals for seventy-two hours or nine meals, since June 19, 2018. Accordingly, all Defendants have missed approximately 65 consecutive meals. In his affidavit, Dr. Charbonneau averred that all Defendants have lost between six percent and eight percent of their pre-hunger strike weight. Dr. Charbonneau testified that, as of July 2, 2018, the Defendants have refused to allow medical personnel to monitor their weight and vital signs or cooperate with medical personnel in monitoring Defendants' condition during their hunger strikes. Dr. Charbonneau testified that if Defendants continued their hunger strike they would all approach a weight loss percentage of eighteen percent—the point at which organ damage would occur. Dr. Charbonneau testified that, in his medical opinion, laboratory tests and physical examinations are now necessary to monitor Defendants' weight and other vital signs to determine when Defendants may be in imminent danger of death and, thus, when the involuntary administration of nutrients and liquid might become necessary. Dr. Charbonneau testified that Defendants would need to have three meals a day for one week before it would be safe to stop monitoring them.

"Unlike the strict standards of scrutiny applicable to the constitutional rights of persons in free society, the Supreme Court has adopted a deferential standard for determining whether a prison regulation violates an inmate's constitutional rights. A prison regulation, even though it infringes the inmate's constitutional rights, is an actionable constitutional violation only if the regulation is unreasonable." *Hakim v. Hicks*, 223 F.3d 1244, 1247 (11th Cir. 2000). In *Turner v. Safley*, 482 U.S. 78, 84 (1987), the Supreme Court identified several factors that serve to channel the reasonableness inquiry: (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and

2

the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns. *See Hakim*, 223 F.3d at 1247-48. Prisoners generally do not have an interest in risking death from a hunger strike such that they may refuse treatment; however, to the extent that such an interest exists, it is easily overridden. *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006); *see Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998) ("Compelling governmental interests, such as the preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline, outweigh the constitutional rights [to continue a hunger strike to the point of death] asserted by [the prisoner] in the circumstances of this case.").

Applying the *Turner* factors to the facts of this case, the Court finds that an emergency condition exists. Defendants have not eaten in over twenty-two days and refuse to allow their health to be monitored. The Court finds that the testimony of Dr. Charbonneau and the averments contained in the affidavits show that the Government must intervene to monitor Defendants to ascertain when Defendants may be in imminent danger of death. Defendants have other avenues than this hunger strike to protest their detention or appeal their denial of bond; the record shows that Defendants have cases pending in the Northern District of Georgia. Doc. 1-1 at 1-7.

The Court finds that, while the Government's legitimate interest in saving the lives of Defendants is not directly implicated at this time, the Government must be able to effectively monitor Defendants to preserve the Government's interest, and that this interest is rationally related to the regulations currently in place at the SDC and the measures the Government seeks from this Court. The Court further finds that allowing Defendants to continue their hunger strike in this instance without monitoring could result in Defendants' death such that the staff, inmates, and resources of the SDC would be greatly impacted—which are legitimate penological concerns. Finally, the Court finds that requiring monitoring and soft restraints to effectuate such monitoring do not constitute an exaggerated response to the Government's legitimate penological concerns.

Thus, the Government's Motions, Docs. 2 & 3, are **GRANTED in part**. ICE, acting through the SDC, is authorized, through competent medical authority, to monitor

Defendants' vital signs, to take Defendants' blood pressure, and to check Defendants' heart-rate and weight once a day. As medically indicated by these tests, ICE may draw blood from Defendants and conduct urinalysis every forty-eight hours as necessary. ICE is further authorized to utilize soft restraints if Defendants resist these medically-necessary tests and evaluations.

ICE's authorization to conduct these tests and evaluations shall remain in effect until Defendants eat three meals a day for seven consecutive days (*i.e.*, Defendants are no longer on a hunger strike). In the event any of the Defendants' hunger strikes continue past August 1, 2018, the Government shall file with the Court a status report every Friday regarding Defendants' hunger strikes and health, and the Court will consider whether to continue this Order. Additionally, if Defendants end their hunger strike, the Government shall immediately inform the Court.

The Government's request for an order authorizing ICE to administer fluids or medications to Defendants intravenously is **DENIED**. The Government has not presented evidence indicating that Defendants' conditions are life threatening. Thus, the Government has not demonstrated that the forced administration of liquids or medication to Defendants at this time "is necessary in order to preserve [their] li[ves]." *See Dep't of Homeland Sec. v. Ayvazian*, 2015 WL 5315206, at *3 (S.D. Fla. Sept. 11, 2015) (granting ICE authorization to force-feed where evidence demonstrated that the medical conditions of the prisoners who continued to hunger strike "have deteriorated to the point where involuntary administration of nutrients is necessary in order to preserve their lives" as their test results "indicated that initial signs of organ damage, due to the lack of nutrition, was occurring"; "Dr. Ortega's medical opinion was that administration of nutrients . . . was medically necessary to preserve their lives, and that the administration of nutrients should occur as soon as possible."); *see also Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) ("Bureau of Prison regulations authorize medical officers to force-feed an inmate if they determine that the inmate's life or permanent health is in danger. Attachments to [the prisoner's] pleadings reveal that USMCFP medical officers determined that forced-feeding was necessary to his health.").

If, as Defendants' hunger strikes continue, their health deteriorates to a point where their lives are in imminent danger or where forced-administration of nutrients or liquid will be necessary to preserve their lives, the Government may renew its motion.

Accordingly, the Government's Motions, Docs. 2 & 3, are **GRANTED in part and DENIED in part**.

**SO ORDERED**, this 24th day of July, 2018.

                                                 /s/ Leslie J. Abrams
                                                 **LESLIE J. ABRAMS, JUDGE**
                                                 **UNITED STATES DISTRICT COURT**